**VALENTI LAW APC**
Matthew D. Valenti (SBN 253978)
mattvalenti@valentilawapc.com
10174 Austin Drive #1116
Spring Valley, CA 91979
Phone: (619) 540-2189

Attorney for Plaintiff Judi Rivera

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUDI RIVERA,<br><br>           Plaintiff,<br><br>  vs.<br><br>STADCO LA, LLC; HOLLYWOOD PARK LAND COMPANY, LLC; and DOES 1-10,<br><br>         Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>DENIAL OF CIVIL RIGHTS AND ACCESS TO PUBLIC FACILITIES TO PHYSICALLY DISABLED PERSONS IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, (42 U.S.C. §12101, *et seq.*) AND THE UNRUH CIVIL RIGHTS ACT, (CALIFORNIA CIVIL CODE §51, *et seq.*)<br><br><u>DEMAND FOR JURY TRIAL</u> |

*"[T]he continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous."* 42 U.S.C. §12101(a)(8).

*"It is the policy of this state to encourage and enable individuals with a disability to participate fully in the social and economic life of the state ..."* California Government Code §19230(a).

Plaintiff JUDI RIVERA (hereinafter referred to as "Plaintiff" or "Ms. Rivera") complains of STADCO LA, LLC a Delaware limited liability company; HOLLYWOOD PARK LAND COMPANY, LLC, a Delaware limited liability company; and DOES 1-10 (each, individually a "Defendant" and collectively "Defendants") and alleges as follows:

## I.    PARTIES

1.    Plaintiff JUDI RIVERA is a California resident and a qualified physically disabled person. Plaintiff is a disabled person who uses a wheelchair for mobility. She is a double amputee, has a rare blood disorder, and is diabetic. Plaintiff is a member of a protected class of individuals guaranteed rights under state and federal law. Ms. Rivera prides herself on her independence and on empowering other disabled people to be independent.

2.    Defendants STADCO LA, LLC; HOLLYWOOD PARK LAND COMPANY, LLC; and DOES 1-10, are and were the owners, operators, lessors and/or lessees of the subject business, property, and facility at all times relevant to this Complaint.

3.    Plaintiff does not know the true names of Defendants, their business capacities, their ownership connection to the property and business, or their relative responsibilities in causing the access violations herein complained of, and alleges a joint venture and common enterprise by all such Defendants. Plaintiff is informed and believes that each of the Defendants herein, including DOES 1

through 10, inclusive, is responsible in some capacity for the events herein alleged, or is a necessary party for obtaining appropriate relief. Plaintiff will seek leave to amend when the true names, capacities, connections, and responsibilities of the Defendants and Does 1 through 10, inclusive, are ascertained.

4.     Defendants own and owned the property located at 1001 Stadium Dr, Inglewood, CA 90301 ("Subject Property") at all relevant times.

5.     Defendants operate and operated a multipurpose professional football and event stadium doing business as SoFi Stadium, located at the Subject Property, at all relevant times.

6.     Plaintiff alleges that the Defendants have been and are the owners, franchisees, lessees, general partners, limited partners, agents, trustees, employees, subsidiaries, partner companies and/or joint ventures of each of the other Defendants, and performed all acts and omissions stated herein within the course and scope of such relationships causing the damages complained of herein.

## II.    JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §1343(a)(3) and (a)(4) for violations of the Americans with Disabilities Act of 1990, U.S.C. §12101, *et seq*.

8.     Pursuant to supplemental jurisdiction, an attendant and related cause of action, arising out of the same nucleus of operative facts and arising out of the same transactions, is also brought under California's Unruh Civil Rights Act, which expressly incorporates the Americans with Disabilities Act.

9.     Venue is proper in this court pursuant to 28 U.S.C. U.S.C. §1391(b) and is founded on the fact that the real property which is the subject of this action is located in this district and that Plaintiff's causes of action arose in this district.

## III.    INTRODUCTION

10.     This lawsuit stems from a failure by a premier Los Angeles stadium to ensure its disabled patrons can reach their pre-arranged accessible transportation in

time to catch their ride and not end up stranded late at night with no viable alternatives to get home.

11.     Plaintiff Judi Rivera experienced just such a failure when she and a friend went to a summertime Shakira concert at SoFi Stadium in Inglewood, California. This lawsuit is the result of SoFi Stadium blocking off the shortest, most accessible path to Ms. Rivera's pre-arranged accessible transportation—a distance of approximately just over 1,000 feet along a wide pedestrian promenade—and instead requiring her to travel along narrow, crowded sidewalks for a distance well over 4,000 feet, *nearly the entire circumference of the stadium property*, only to be turned back anyway and not allowed through to their accessible transportation.

12.     The predictable result was that Ms. Rivera and her companion missed their pre-arranged accessible transportation. Their ride home was to be provided by a public transportation service named Access, which requires riders to board their vehicles at pre-arranged stands, similar to bus stops. Despite leaving the Shakira concert well before it ended, and thirty-five to forty-five minutes before their scheduled pick-up time, metal security barriers made it impossible for Ms. Rivera and her companion to get to the Access stand in time. And despite clearly explaining her situation to several different stadium staff members, no one was willing to help her. Instead, all the staff members she asked would only repeat the incorrect instructions that she should go to Kia Forum north of SoFi Stadium "for all rideshare vehicles," despite Access not being a rideshare program.

13.     Rather than being able to savor the experience of the concert, Ms. Rivera was forced to spend her post-concert hours stressed, exhausted, and extremely embarrassed to inconvenience her companion, as they first tried desperately to make it to their prearranged pickup location, and then, having missed their Access ride, scramble to arrange another one. It was nearly 3:00 a.m. by the time they finally got home.

14.     Ms. Rivera is likely not the only disabled person to have encountered this egregious violation of accessibility regulations at SoFi Stadium on this night or other nights. But through this lawsuit she seeks to be the last disabled person to have to endure it.

## IV.    FACTS AND ALLEGATIONS

15.     SoFi Stadium, the home of the Los Angeles Rams and Los Angeles Chargers, is located "at Hollywood Park, a near 300-acre sports and entertainment destination owned, being developed and operated by Los Angeles Rams Owner/Chairman E. Stanley Kroenke in Inglewood, California." It is a five-year-old, 3.1 million-square-foot multi-purpose stadium, and "is the largest stadium in the NFL, as well as the first indoor-outdoor stadium. It seats approximately 70,000, expandable up to 100,000, with more than 260 luxury suites and more than 13,000 premium seats."[1]

16.     Judi Rivera a disabled person who uses a wheelchair for mobility. She is a double amputee, has a rare blood disorder, and is diabetic.

17.     Ms. Rivera is an honorably discharged Army veteran and a recent widow. She met her late husband in the Army, and together they raised two children. Around the time her husband passed away she began suffering from severe complications of diabetes. Over the course of five surgeries between May 2022 and January 2023, she underwent an amputation of her right leg below the knee and an amputation of all the toes on her left foot. Then followed months of hospitalization, recovery, and physical therapy.

18.     In the years since her amputation surgeries, Ms. Rivera has worked very hard to learn to use a wheelchair and to independently care for herself. She

---

[1] https://www.sofistadium.com/stadium

has a "can do" spirit she developed in the service, and she is determined to enjoy her life to the fullest.

19.    One of Ms. Rivera's favorite things to do is attend concerts and shows. As a veteran, she has access to discounted tickets for such events, and she attends them frequently with close friends. These events are a very important part of her life. They provide opportunities to socialize with friends, to experience the many entertainment options in Los Angeles, and to simply have fun. Going out to concerts is a critical part of Ms. Rivera's mental health and well-being because it provides the kind of life-affirming experiences of independence and autonomy that every disabled person needs and deserves.

20.    Whenever Ms. Rivera buys tickets to a concert, she carefully arranges her schedule and transportation to ensure she can reach the concert location, and then return home, safely and on time. Ms. Rivera, like many wheelchair users, knows from experience that if she doesn't carefully plan her transportation—not just for concerts but also for doctor's appointments, routine errands, or anywhere else that requires travelling by vehicle—she is likely to face difficulties and delays. Not all public buses, for example, are equipped for wheelchair access. Uber and Lyft drivers will often refuse to pick up a wheelchair user. Elevators at subway stops are often out of service. Thus it is very important that wheelchair users plan their transportation carefully if they wish to have a successful outing. Ms. Rivera is particularly meticulous in her planning, and because she is so meticulous, she has had very few if any transportation problems in the years since she began using a wheelchair—until now.

21.    One of the reasons Ms. Rivera has had few transportation issues is because she has been approved as a rider for "Access," an accessible transportation system for disabled people.

22.     As described on its website, "Access is the service name of the ADA Complementary Paratransit service for functionally disabled individuals in Los Angeles County."[2]

23.     According to the Access website, Access is a "curb-to-curb shared-ride service," in which "[s]everal riders will be transported at one time in the same vehicle. It is not a cab service, emergency medical or social service transportation, and is not door-to-door or a private transportation service. Access provides service within ¾ mile of fixed-route bus and rail line in Los Angeles County. Access operates on the same schedule as most buses. Regular service is offered from 4:00 AM to 12:00 AM, 7 days a week. Limited service is available from 12:00 AM to 4:00 AM. As a shared ride service your travel time will be similar to that of a fixed-route bus, not a car or taxi."[3]

24.     Access is provided by a local public agency named Access Services, the Los Angeles County Consolidated Transportation Services Agency ("CTSA") which administers the Los Angeles County Coordinated Paratransit Plan.[4]

25.     Pursuant to the Los Angeles County Coordinated Paratransit Plan, "Access facilitates the provision of complementary ADA paratransit services to certain persons with disabilities as required by 42 U.S.C. §12143 under the name 'Access Paratransit.' Paratransit is an alternative mode of flexible passenger transportation that does not follow fixed routes or schedules. Typically, vans or mini-buses are used to provide paratransit service, but also shared taxis and jitneys are important providers as a form of transportation. Complementary ADA paratransit is a federally mandated civil right for persons with disabilities who cannot ride the accessible public fixed route buses and trains."[5]

---

[2] https://accessla.org/riding_access/overview.html
[3] Id.
[4] https://accessla.org/about_us/overview.html
[5] Id.

26.     The fares for Access are affordable, which is important to Ms. Rivera, since she is on a limited budget. A One-Way fare for trips up to 19.9 miles is $2.75, and $3.50 for trips of 20 or more miles. Access users may bring a personal care attendant for free, or a guest who pays the standard fare.[6] This enables Ms. Rivera to use Access to go places throughout Los Angeles with friends.

27.     Users of Access like Ms. Rivera may reserve rides through their online account, through the Access "My Ride" app, or by calling the Access customer service line.[7]

28.     Since Access is not a door-to-door or a private transportation service such as taxis or rideshare services like Uber and Lyft, but operates more like a bus system, it has established pick-up and drop-off stands at many destinations throughout Los Angeles County. "These stands make locating a rider or a drop-off location easier for the driver and reduce the chance of complications."[8]

29.     While the drop-off location of a passenger can be flexible, *i.e.*, a driver will drop off a passenger somewhere other than at an established stand, there is no such flexibility for picking up passengers at a pre-scheduled location. Riders must be at the pre-arranged stand location within the allotted window of pick-up time, or else the Access vehicle will depart without them.

30.     Access strictly enforces a five-minute pick-up window. An Access driver "will wait only five minutes for [the passenger with a reservation] to arrive at the curb. If the driver is early, the five-minute wait begins at [the passenger's] scheduled pick-up time. After five minutes, the driver will request approval from

---

[6] https://accessla.org/sites/default/files/Publications/Rider's%20Guide%20English%2002012025.pdf
[7] *Id.*
[8] *Id.*

their Dispatcher to depart the location and no show the rider. Once approved, the driver will depart and [the passenger] will be assessed a no show."[9]

31.    Being assessed a "No Show" can have serious consequences. "If [the passenger] [is] a No Show, [the passenger] will receive a written notice after the second incident. A person who has 5 or more Rider No Shows in a calendar month and whose No Shows exceed 10% of their overall trips taken within the same calendar month may be temporarily suspended from using Access."[10]

32.    In the summer of 2025 Ms. Rivera bought two discounted tickets to see pop singer Shakira perform at Sofi Stadium. Shakira performed at Sofi Stadium on two nights, August 4th and August 5th.[11] Ms. Rivera bought tickets for the August 5th performance.

33.    Both SoFi Stadium itself and Access have established accessible transportation policies for the stadium. Ms. Rivera followed these policies exactly.

34.    The webpage maintained by SoFi Stadium for Shakira's concert dates includes information and links for visiting SoFi. The first item is titled "How do I get to SoFi Stadium?" By clicking on a drop-down arrow, a visitor to the website sees the following information under that query: "Visit our **parking & transportation** page for more information on getting to SoFi Stadium and rideshare information."[12]

35.    Clicking the hyperlinked "parking & transportation" text opens SoFi Stadium's "Parking and Transportation" page, which is a sub-page under the "Plan Your Visit" section of Sofi Stadium's website. At the bottom of a list of parking

_____

9 *Id.*
10 *Id.*
11 https://www.sofistadium.com/events/detail/shakira-2025
12 *Id.*

and transportation topics on the "Parking and Transportation" page is the hyperlinked topic titled "Accessible Parking."[13]

36.     The "Accessible Parking" hyperlink opens SoFi Stadium's "Accessible Parking" page. The hierarchy of informational pages is visible at the top of the page and reads "Home/Plan Your Visit/Parking and Transportation/Accessible Parking."[14] This page contains not only parking information, but also information about SoFi Stadium's accessible pick up and drop off location for each of two categories of events: "NFL Games" and "Concerts and Non-NFL Games."  Under "Private Auto ADA Drop Off," visitors are instructed to "drop off on District Dr. between Champions Way and Touchdown Dr."; under "Private Auto ADA Pickup," visitors are instructed to "turn left onto Victory St. and then a left onto District Dr. Drivers will be permitted to stage between Champions Way and Touchdown Dr."[15] This ADA drop off and pick up location for concerts and non-NFL events (District Dr. between Champions Way and Touchdown Dr.) is also the ADA drop off and pick up location for NFL games.[16]

37.     Access's website maintains a "Stand Information Directory."[17] The page explains that **"Access Services has pick-up and drop-off stands, similar to bus stops, at a variety of popular locations along common routes. Use this search to find convenient locations for your needs."[18] The page has an embedded Google map of the greater Los Angeles region with numerous red "i" pins marking the location of its pick-up and drop-off stands, as well as a drop-down menu with the

---

[13] https://www.sofistadium.com/plan-your-visit/parking-and-transportation
[14] https://www.sofistadium.com/plan-your-visit/parking-and-transportation/accessible-parking
[15] *Id.*
[16] *Id.*
[17] https://accessla.org/other_mobility_resources/stand_info
[18] *Id.*

phrase "Select Facility."[19] Using either the embedded map to navigate to SoFi stadium's "i" pin, or selecting "SoFi Stadium – Inglewood" on the the drop-down facility menu will take the user to a subpage with specific information about Access's SoFi Stadium pick-up and drop-off stand.[20] The information on this subpage appears as follows:[21]

| Stand # | Stand Description |
|---------|------------------|
| 1 | **Stand 1: Stand sign is located at the corner of District Dr. and Touchdown Dr.**<br>**GeoCode: 33.953501, -118.342071**<br>**District Dr & Touchdown Dr** |

38.    By clicking on the hyperlinked information, the user is taken to Access's dedicated SoFi Stadium pick-up and drop-off stand page.[22] The page identifies the Facility Name as a hyperlinked "SoFi Stadium – Inglewood."[23] It identifies the stand as #1, and the Stand Location as follows: "Stand sign is located at the corner of District Dr. and Touchdown Dr." More information below states "Stand 1: Stand sign is located at the corner of District Dr. and Touchdown Dr. GeoCode: 33.953501, -118.342071" and under "Comments" is the following: "District Dr & Touchdown Dr".[24] this page also contains an embedded Google

---

[19] *Id.*
[20] https://accessla.org/other_mobility_resources/stand_info?sfid=3339
[21] *Id.*
[22] https://accessla.org/sofi-stadium.html
[23] *Id.*
[24] *Id.*

map which has an "i" pin located on the east side of the intersection of District Dr. and Champions Way (which is also just south of the intersection of District Dr and Touchdown Dr.).[25] The page also has two photos, each showing a different view of an Access vehicle parked on the street just behind an Access stand sign labeled "Stand 1."[26] See below.



/ /

/ /

/ /

/ /

---

[25] *Id.*
[26] *Id.*



39.     A comparison of these photos with recent Google Streetview images confirms the photos were taken on the east side of District Dr. near the intersection of Champions Way, just south of Touchdown Drive.

40.     There is no evidence or indication that Access maintains any other pick-up and drop-off stand at SoFi Stadium than Stand 1. It is the one and only Access stand serving SoFi Stadium.

41.     As noted above, both of Access's SoFi Stadium stand webpages include the following GeoCode (latitude/longitude coordinates) location: 33.953501, -118.342071. Entering these coordinates in Google maps takes the user to a satellite view of SoFi Stadium, with the red location marker located exactly at

the east side of District Dr. at the intersection with Champions Way, just south of Touchdown Drive.[27]

42.    Champions Way is both a vehicular street and the name of an adjoining pedestrian promenade. Both the street and the promenade span the entire length of the west and southwest side of SoFi Stadium.[28]

43.    Importantly, the Champions Way pedestrian promenade provides the most direct and accessible route connecting the Access Sofi Stadium pick-up and drop-off stand to all nine of the gates on the west and south sides of the stadium. The promenade is also the most direct and accessible route connecting these gates with accessible parking in the parking lots to the west and southwest of the stadium.

44.    In fact the majority of the stadium's gates are on the west/southwest side of the stadium (gates 5, 6A, 6B, 7, 8A, 8B, 9A, 9B, 9C, and 9D). There are only four gates on the north side of the stadium (gates 1, 2, 3, and 4), and on the east side of the stadium there are only three gates, two of which are VIP-only gates (10, 11, and 12). See relevant enlarged detail of Sofi Stadium's official 2025 map below.[29]

/ /

/ /

/ /

/ /

/ /

/ /

---

[27] https://www.google.com/maps/place/33%C2%B057'12.6%22N+118%C2%B020'31.5%22W//@33.9535054,-118.3446513,755m/data=!3m2!1e3!4b1!4m4!3m3!8m2!3d33.953501!4d-118.342071?entry=ttu&g_ep=EgoyMDI1MTAyOS4yIKXMDSoASAFQAw%3D%3D
[28] Id.
[29] https://www.sofistadium.com/assets/img/Overall_SoFiStadium_Map_2025-20147a9837.jpg

45.    Using the measurement tool on Google Maps, the approximate distance from Gate 8A (which is approximately where Ms. Rivera exited the stadium) northwest along Champions Way to the Access SoFi Stadium pick-up and drop-off stand is approximately 1,269' total. (See screenshot below.)

46.    The approximate distance from Gate 8A, along the southeast end of Champions Way, then north along Stadium Drive (on the east side of the stadium), west along Touchdown Drive (on the north side of the stadium), and then south on District Dr. along the west side of the stadium to the Access SoFi Stadium pick-up and drop-off stand, is 4,839' total. (See screenshot below.)

/ /

/ /

/ /

/ /

/ /

/ /

/ /



47.    This route traverses almost the entire circumference of the stadium and is approximately 3,500 feet longer than the short route from Gate 7 to the Access SoFi Stadium pick-up and drop-off stand.

48.    Moreover, the shortest route is entirely along the flat, wide-open pedestrian promenade of Champions Way, while the longest route is mostly along an approximately 5' wide sidewalk. This sidewalk has crowd control barriers along the entire length of it to keep pedestrians from crossing Stadium Drive. These barriers, along with areas of overgrown landscaping on the stadium-side of the sidewalk, effectively narrow the clear width of the sidewalk by approximately 18" or more. The sidewalk is difficult and time-consuming to navigate in a wheelchair when a stadium event is ending and the sidewalk is crowded with people.

49.    As detailed further below, the short route from Gate 8A to the Access stand is the route Ms. Rivera should have been able to take, while the long route

circumnavigating the stadium from Gate 8A to the Access stand is the route she actually had to take. (And Ms. Rivera didn't just travel along the long route while attempting to get to her Access ride; first she and her companion attempted in vain to find a route around the artificial lake on the southwest side of the stadium. Thus Ms. Rivera likely travelled a mile or more attempting to make it to her ride, rather than the approximately one-fifth of a mile route she should have been able to travel.)

50.    SoFi Stadium's website maintains a page titled "Accessibility."[30] It contains several topic subheadings, one of which is titled "Entries." Under Entries is the following information: "Each entry offers an accessible path. During NFL games, General admission Guests will enter from the North or South depending on their seating location. VIP or Premium Guests will enter from any Entry and will be directed to the closest entrance for their seat location. **For all other events, each entry offers an accessible path**."[31]

51.    On August 4th, Ms. Rivera called Access and scheduled her trip for the next night to and from SoFi Stadium. She scheduled the pick-up time for 4:40 p.m. at her home, and the return ride for 11:15 p.m., departing from the Access Stand 1 on District Drive near Champions Way and Touchdown Dr.

52.    At 4:40 p.m. on August 5th, Access picked up Ms. Rivera and her friend as scheduled. When they arrived at SoFi Stadium, the driver entered a parking lot on the east side of the stadium. He may have asked a stadium employee directing traffic whether he could drop off passengers there; in any event, the driver asked Ms. Rivera and her companion if they wanted to be dropped off there. Since it was close to an entrance and there was still time to reach their seats before the concert began, Ms. Rivera agreed to be dropped off there.

---

[30] https://www.sofistadium.com/plan-your-visit/accessibility
[31] *Id.*(Emphasis added).

53.    Importantly, no change was made by either Ms. Rivera or Access to the scheduled pick-up time of 11:15 p.m.  or to the pick-up location at the Access Stand 1 on District Drive near Champions Way and Touchdown Drive.

54.    Once in the stadium, Ms. Rivera and her companion went to Guest Services and asked stadium staff to exchange her tickets, which were standard seats, for tickets to accessible seating. This is a common request that many stadiums and theaters grant when such accessible seats are available. Since accessible seats were available when Ms. Rivera entered the stadium, the stadium staff granted the request and relocated Ms. Rivera and her companion's seating to accessible seating on the west side of the stadium.

55.    While they were at Guest Services, Ms. Rivera's companion asked the two women working there to confirm the location of the Access pickup. Neither of them knew where it was, other than that it was "near a Sofi Stadium sign." One of the employees, a Latina woman, picked up the phone and presumably spoke with her supervisor to ask, but the supervisor apparently didn't know either. It is likely the Guest Services employees were correct that the Access stand is "near a Sofi Stadium sign," as such a sign can be seen in the second photo of Access's Sofi Stadium stand website page, as shown in ¶37 above.

56.    Between about 10:30 p.m. and 10:45 p.m., Ms. Rivera and her companion left their seats and began exiting the stadium. Shakira was still performing, and they would have liked to stay until the end of the concert. But Ms. Rivera wanted to ensure she had plenty of time to get out of the stadium and reach the Access pick-up location before 11:15 p.m.

57.    Ms. Rivera would have been able to reach the Access pick-up location by 11:15 p.m., easily and with time to spare, had she not encountered a shocking situation which changed the course of the next several hours of her life.

58.    Upon exiting the stadium at or around Gate 8A along Champions Way, Ms. Rivera immediately became aware of the presence of numerous metal

security barriers throughout Champions Way promenade and on the vehicular Champions Way as well. The barriers were blocking all routes and paths of travel north towards the Access Stand 1. There were numerous stadium staff members who were directing everyone to go south and east along Champions Way—the opposite direction Ms. Rivera needed to go.

59. There was no signage indicating alternate routes, and there appeared to be no way around the security barriers. Though Ms. Rivera witnessed some concertgoers moving barriers aside to get past them, this was not something she was physically able to do, nor would she want to disobey the instructions of stadium staff members.

60. Ms. Rivera and her companion attempted to go around the lake that is situated to the southwest of the stadium, but all available routes in that direction were either blocked by security barriers or utterly impassible for someone using a wheelchair.

61. Ms. Rivera told several staff members that she needed to go north on Champions Way to reach her Access pick-up location. But every staff member she spoke with said that she had to go south and east along Champions Way and then north on Stadium Drive. According to some staff members, Ms. Rivera would be allowed through the barriers on the northwest side of the stadium once she got there. Other staff members insisted she would have to continue north to the Kia Forum instead. When Ms. Rivera asked one such staff member with a name tag reading "Jimmi" to speak to someone in charge, he replied, "I am in charge," and insisted she go in the complete opposite direction of the Access stand.

62. So Ms. Rivera and her companion had to retrace their route back to where they had exited the stadium, and then south and east until they reached Stadium Drive on the east side of the stadium where, having no other choice, they proceeded north.

63.     One of the staff members Ms. Rivera spoke to explained that the security barriers that were blocking all routes to the Access stand had been left there "after a music festival." Indeed, on August 2 and August 3 there was a music festival known as the HARD Summer Music Festival, "once again taking place at Hollywood Park, the expansive entertainment complex adjacent to SoFi Stadium and YouTube Theater."[32] This was the second year the festival was located on the grounds of SoFi Stadium, a 300 acre venue that offers "a fresh, immersive atmosphere for attendees with its spacious layout, interactive features, and innovative activations, making it the largest event of its kind in the city."[33]

64.     On the HARD Summer Music Festival website is a map of the 2025 festival.[34] The map indicates that Champions Way, including the entire route from Gate 8 and Gate 9 to the Access stand, was the site of numerous festival activities. These included two bars serving alcohol, numerous food trucks and other food concessions, a cell phone charging station, and something known as the Beatbox Boombox Art Car, a large motor home that has been converted into a giant DJ booth and sound system, with people dancing inside, outside, and on top of the vehicle.[35]

65.     It is likely that the security barriers which blocked Ms. Rivera from reaching the Access stand had been placed there for the music festival to manage crowds lining up for alcohol and food, or dancing in front of a massive Boombox, among other activities taking place at the festival. Unfortunately, by leaving the barriers in Champions Way for at least two days beyond the end of the festival, SoFi Stadium caused these literal physical barriers to become illegal accessibility

_____

[32] https://www.sofistadium.com/news/detail/hard-summer-music-festival-announces-lineup-for-2025-edition-1
[33] Id.
[34] https://www.hardsummer.com/info/festival-map/#
[35] https://www.youtube.com/watch?v=2OoLVpPukNQ

barriers for Ms. Rivera and other disabled people during the two nights of Shakira's concerts.

66.    As the clock ticked, Ms. Rivera and her companion struggled in a panic to reach the Access stand where they knew their ride home would be waiting for them—but only for five minutes between 11:15 p.m. and 11:20 p.m. (They would later learn that the driver waited much longer than five minutes in an attempt to allow the scheduled passengers time to arrive at the stand, but had no way of knowing this at the time—and in any event, would still not have made it to the stand in time before the driver finally left.)

67.    Despite explaining their predicament to numerous stadium staff members, Ms. Rivera received no assistance whatsoever. The staff members would simply repeat the incorrect instructions that either Ms. Rivera would be allowed through the barriers on the northwest side of the stadium or that they needed to get a ride at the Kia Forum.

68.    Ms. Rivera's companion pushed her wheelchair most of the way. This was very embarrassing to Ms. Rivera but Ms. Rivera and her companion had no other choice if they had any chance of reaching the Access stand by going the long way around SoFi Stadium. The route was long, and the sidewalk along Stadium Drive was crowded with people leaving the concert, which made it even slower for Ms. Rivera to travel in her wheelchair. Realizing they would almost certainly not be able to make it to the stand in time, Ms. Rivera called Access's customer service line and explained the situation.

69.    The dispatcher she spoke with told her that the pick-up location could not be moved, and the driver had a schedule to keep and could not wait at the SoFi Stadium stand any longer than the standard five minutes. Ms. Rivera and her companion continued to try desperately to reach the stand.

70.    When they finally got to the northwest corner of the stadium, near the intersection of Champions Way and District Drive, they were within a few hundred

feet of the Access stand. But there was a line of stadium staff and barriers blocking the way. It is not clear whether the Access driver was still waiting at the stand behind, but it wouldn't have mattered even if the vehicle was still there. Because despite being told earlier by some staff members that they would be allowed through the barriers at this location, none of the stadium staff stationed at the barriers would allow Ms. Rivera through. Every staff member she spoke with there refused to help her and said the same thing, that they "needed to go to the Kia Forum to get their rideshare."

71.    From the time they left their seats in the stadium, it took Ms. Rivera and her companion approximately an hour to make it to this point. This was an hour of extreme stress, difficulty, embarrassment, and frustration for Ms. Rivera.

72.    Seeing no other option, Ms. Rivera and her companion retraced their route once more and headed east and then north to the Kia Forum. When they got there Ms. Rivera called Access again and scheduled another ride. The dispatcher informed her the next available ride would be at 4:00 a.m., over four hours later. Later, Ms. Rivera would learn that Access had recorded her as a "no-show," for having missed the originally scheduled pickup at Stand 1.

73.    Ms. Rivera's companion attempted to obtain a ride with Uber or Lyft. However, she learned it would cost around $100.00 to reach Ms. Rivera's home. This was far more than Ms. Rivera could afford to pay on her limited budget and would have cost her more than 30 times the cost of the Access ride. Moreover, even if she could afford the cost, she would have no way of entering most rideshare vehicles. She uses a slide board, also known as a transfer board, to transfer in and out of vehicles from her wheelchair. She did not have her slide board with her, as it is unnecessary when taking Access since all Access vehicles are equipped with wheelchair ramps.

74.    Ms. Rivera called Access once more to see if she could schedule a ride any earlier than 4:00 a.m. Fortunately some space had opened up in the

schedule and she was able to book a ride for 1:15 a.m. The new pick-up location would be the Kia Forum.

75.    Ms. Rivera and her companion waited an hour and fifteen minutes until the Access ride arrived. By then it was nearly three hours since they had left the concert. The vast majority of their fellow concertgoers were long gone.

76.    The driver of the Access vehicle, a male employee, informed Ms. Rivera and her companion that he had been the driver on duty for Sofi Stadium earlier that night. He informed them he had waited at the Access stand to pick up Ms. Rivera and other Access riders for about an hour but eventually had to leave without any of his scheduled riders. It is possible, therefore, that had stadium staff allowed Ms. Rivera through the barriers on the northwest corner of the stadium (as many of them promised she would be allowed), she may have been able to make it to her originally scheduled Access ride after all.

77.    Since it was late at night, there were fewer Access vehicles in service, which generally means that there are more riders on each vehicle. On the ride home, the Access vehicle made three more pick-ups and three more drop-offs. One of these locations was a nearby 7-11 where one of the Access passengers leaving the stadium had ended up after also being unable to reach the Access stand.

78.    Because of the number of stops on this Access ride, Ms. Rivera and her companion didn't arrive at Ms. Rivera's home until close to 3:00 a.m.—four and a half hours after Ms. Rivera and her companion left their seats at the concert.

79.    By then Ms. Rivera was exhausted by the stress of getting home from SoFi Stadium. She was deeply frustrated by the fact that no one at SoFi Stadium cared enough to help her get to her ride on time.

80.    Ms. Rivera's companion had to be at work at 6:00 a.m. that same day. The fact that her companion would have to go to work after such a long, unplanned late night made Ms. Rivera feel deeply embarrassed. Although Ms. Rivera's companion was understanding, Ms. Rivera knew that it was experiences like these

that made some people hesitant to go out to events with wheelchair users like herself.

81.    The day after the Shakira concert, Ms. Rivera was determined to help ensure this situation didn't happen to other disabled people at SoFi Stadium. She also knew she would have to think twice before buying tickets to any other event at the stadium in the future. So she went to SoFi Stadium's website and clicked on the "Contact Us" button at the bottom of the page. This took her to the SoFi Stadium Guest Services contact interface.[36] She filled in her name, email address, and phone number. Selecting the Shakira concert as the event she was contacting the stadium about, she left a detailed complaint explaining what had occurred the night before. The Guest Services contact page includes the following message: Please allow forty-eight (48) hours for a response from one of our team members. We look forward to hearing from you!" [37]

82.    Several days passed and Ms. Rivera received no response to her complaint. She then called the main SoFi Stadium phone number and spoke to someone named Pauline. She explained once again what had happened to her the night of the Shakira concert. Pauline said, "Oh yeah, we had a lot of complaints about that and we're answering them in the order we receive them," or words to that effect. Nevertheless, several more days elapsed and Ms. Rivera still did not receive a response to her complaint. Over the next few weeks she called the SoFi Stadium number three more times. Each of these times no one answered the phone and it went straight to a voicemail box. Each time Ms. Rivera got the voicemail she left a voicemail message explaining her complaint. Still, she received no response.

---

[36] https://docs.google.com/forms/d/e/1FAIpQLSfkyOcWXwia72GsD3UUB75H60q1noEwW75e8Ymvhha2eGzCkQ/viewform

[37] *Id.*

83.    Finally, after several weeks of getting no response whatsoever to her numerous contact attempts, Ms. Rivera went back to the SoFi Stadium website and left another complaint. This time, she stated that her experience at SoFi Stadium was a violation of the ADA. Apparently, this got the attention of someone at SoFi Stadium, for on or around September 18, 2025—well over a month after she first registered a complaint—Ms. Rivera finally received a call from Denise Williams, Senior Director of Guest Experience for Hollywood Park. Ms. Rivera explained to Ms. Williams what had occurred at SoFi Stadium on the night she attended the Shakira concert. Ms. Williams confirmed that after the music festival the security barriers had been left in place throughout Champions Way. Ms. Williams expressed concern about the experience Ms. Rivera had at the concert.

84.    Ms. Williams followed up the phone call with an email to Ms. Rivera, dated September 18. Her entire message was as follows: "Hello Judi, thanks for taking my call and explaining to me about your challenges.  I am going to look into the situation and get back to you. Denise".

85.    Ms. Rivera thought she had finally reached someone at SoFi Stadium who cared about what happened to her. But that was to be a short-lived assumption. To this day Ms. Williams has never gotten back to Ms. Rivera, either by phone or email.

86.    Having tried to seek help numerous times on the night of the concert and being ignored, incorrectly instructed, and condescended to by stadium staff, having tried many times in the days and weeks that followed to register a complaint and receive a substantive response, yet still be ignored and disregarded, Ms. Rivera is left with no other option. She brings this lawsuit to rectify SoFi Stadium's egregious deprivation of her civil right to full and equal access, and to ensure it never happens to her or another disabled person again.

87.    Plaintiff alleges and incorporates by reference, as if fully set forth again herein, each and every allegation contained in all prior paragraphs of this complaint.

88.    Plaintiff uses a wheelchair for mobility.

89.    Defendants' business is open to the public, a place of public accommodation, and a business establishment.

90.    Plaintiff went to Defendants' business on August 5, 2025 to attend a concert.

91.    Unfortunately, during Plaintiff's visit, Defendants did not offer persons with disabilities equivalent facilities, privileges, advantages, and accommodations offered to other persons.

92.    Plaintiff encountered barriers that interfered with and denied Plaintiff the ability to use and enjoy the goods, services, privileges, advantages, and accommodations offered by Defendants at the Subject Property.

93.    These barriers violate one or more standards of the Americans with Disabilities Act ("2010 ADA") and/or the California Building Codes ("2022 CBC").

94.    According to the U.S. Department of Justice, "a public accommodation's first priority should be to enable individuals with disabilities to physically enter its facility. This priority on 'getting through the door' recognizes that providing physical access to a facility from public sidewalks, public transportation, or parking is generally preferable to any alternative arrangements in terms of both business efficiency and the dignity of individuals with disabilities." ADA Title III Technical Assistance Manual §III-4.4500.

95.    The U.S. Department of Justice has published a guidance for accessible stadiums. Under the heading "Accessible Drop-Off and Pick-Up Areas," the DOJ guidance states: "If passenger drop-off areas are provided, they must be accessible and **an accessible route must connect each accessible drop-off area**

**with the accessible entrance(s)**….” *Accessible Stadiums*. U.S. Department of Justice, Civil Rights Division, Disability Rights Section (emphasis added).

96.    Further, the 2010 ADA Standards for Accessible Design clearly provide that “**Security barriers**, including but not limited to, security bollards and security checkpoints, **shall not obstruct a required accessible route or accessible means of egress**.” 2010 ADA §206.8 (emphasis added). The California Building Code has identical standards. 2022 CBC 11B-206.8.

97.    SoFi Stadium had and has an ongoing policy and practice of obstructing and failing to maintain the only accessible route to and from the Access stand, as well as the route to and from the accessible parking and site arrival points on the west side of the stadium. This policy and practice includes a failure to train employees to assist disabled patrons, and/or a policy to train employees to intentionally deprive disabled patrons of an accessible route.

98.    On the night of Plaintiff’s visit and, on information and belief, on numerous other dates, the only accessible route was completely blocked by metal security barriers. There was no accessible route from the Access stand, accessible parking, and site arrival points on the west side of the stadium to the entrance and exit gates of the stadium. This violates numerous standards of the ADA and California Building Code. 2010 ADA §206.2.1; 2010 ADA §206.2.2; 2010 ADA §206.2.3; 2010 ADA §206.8; 2010 ADA §305.3; 2010 ADA §403.5.1; 2010 ADA §403.5.3; 2022 CBC 11B-206.2.1; 2022 CBC 11B-206.2.2; 2022 CBC 11B-206.2.3; 2022 CBC 11B-206.8; 2022 CBC 11B-305.3; 2022 CBC 11B-403.5.1; 2022 CBC 11B-403.5.3.

99.    SoFi Stadium has obstructed or failed to maintain, in working and useable conditions, those features necessary to provide ready access to persons with disabilities. “A public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily

accessible to and usable by persons with disabilities." 28 C.F.R. §36.211(a); 2022 CBC 11B-108.

100.    The State of California Department of General Servicers, Division of the State Architect (DSA) provides commentary to 2022 CBC 11B-108 as follows:

> Features for accessibility must be permanently functional, unobstructed and may not be removed.  It is not sufficient to provide features such as accessible routes, parking, elevators, ramps or signage if those features are not maintained in a manner that enables individuals with disabilities to use them.

DSA, 2019 California Access Compliance Advisory Reference Manual, p.84.

101.    The barriers existed during Plaintiff's visit to the Subject Property. Plaintiff personally encountered these barriers.

102.    As described in detail throughout this Complaint, these inaccessible conditions and barriers denied Plaintiff full and equal access and caused her difficulty, discomfort, and embarrassment.

103.    These barriers denied Plaintiff full and equal access due to her disability because, *inter alia*, they caused Plaintiff anxiety, difficulty, discomfort, and embarrassment which patrons who do not use a wheelchair for mobility do not suffer when they access the Subject Property, as detailed extensively above.

104.    Plaintiff alleges that Defendants knew that the barriers prevented equal access. Plaintiff further alleges that Defendants had actual or constructive knowledge that the architectural barriers prevented equal access, and that the noncompliance with the Americans with Disabilities Act and Title 24 of the California Building Code regarding accessible features was intentional.

105.    Defendants have the financial resources to remove these barriers without much expense or difficulty in order to make their property more accessible to their mobility impaired customers. The United States Department of Justice has identified that these types of barriers are readily achievable to remove.

106.   To date, Defendants refuse to remove these barriers, in violation of the law, willfully depriving disabled persons including Plaintiff of important civil rights.

107.   On information and belief, Plaintiff alleges that the Defendants' failure to remove these barriers was intentional because the barriers are logical and obvious. During all relevant times Defendants had authority, control, and dominion over these conditions and therefore the absence of accessible facilities was not a mishap, but rather an intentional act.

108.   The barriers to access are listed above without prejudice to Plaintiff citing additional barriers to equal access by an amended complaint after inspection by Plaintiff's Certified Access Specialist (CASp). *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. 2011); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008); *Chapman v. Pier One Imports (USA), Inc.*, 631 F.3d 939 (9th Cir. 2011). All of these barriers to access render the premises inaccessible to physically disabled persons who are mobility impaired, such as Plaintiff, are barriers Plaintiff may encounter when she returns to the premises. All public accommodations must be brought into compliance with all applicable federal and state accessibility requirements.

## FIRST CAUSE OF ACTION

Violation of the Americans With Disabilities Act of 1990

(42 U.S.C. §12101, *et seq.*)

(Against All Defendants)

109.   Plaintiff alleges and incorporates by reference, as if fully set forth again herein, each and every allegation contained in all prior paragraphs of this complaint.

110.   More than thirty years ago, the 101st United States Congress found that although "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental

disabilities have been precluded from doing so because of discrimination…in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. §12101(a).

111.   In 1990 Congress also found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals," but that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. §12101(a).

112.   In passing the Americans with Disabilities Act of 1990, which was signed into law by President George H. W. Bush on July 26, 1990 (hereinafter the "ADA"), Congress stated as its purpose:

"It is the purpose of this Act

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this Act on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day to-day by people with disabilities."

42 USC §12101(b).

113.   As part of the ADA, Congress passed "Title III – Public Accommodations and Services Operated by Private Entities" (42 U.S.C. §12181 *et seq*.). Title III of the ADA prohibits discrimination against any person "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §12182(a).

114.   The specific prohibitions against discrimination include, *inter alia*, the following:

- 42 U.S.C. §12182(b)(1)(A)(ii): "Participation in Unequal Benefit. - It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals."

- 42 U.S.C. §12182(b)(2)(A)(ii): "a failure to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities...;"

- 42 U.S.C. §12182(b)(2)(A)(iii): "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied service, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services...;"

- 42 U.S.C. §12182(b)(2)(A)(iv): "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities... where such removal is readily achievable;"

- 42 U.S.C. §12182(b)(2)(A)(v): "where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages,

or accommodations available through alternative methods if such methods are readily achievable."

115.    Plaintiff is a qualified individual with a disability as defined in the Rehabilitation Act and in the Americans with Disabilities Act of 1990.

116.    The acts and omissions of Defendants set forth herein were in violation of Plaintiff's rights under the ADA and the regulations promulgated thereunder, 28 C.F.R. Part 36 *et seq*.

117.    The removal of each of the physical and policy barriers complained of by Plaintiff as hereinabove alleged, were at all times herein mentioned "readily achievable" under the standards of §12181 and §12182 of the ADA.  Removal of each and every one of the architectural and/or policy barriers complained of herein was already required under California law. Further, on information and belief, alterations, structural repairs or additions since January 26, 1993, have also independently triggered requirements for removal of barriers to access for disabled persons per §12183 of the ADA. In the event that removal of any barrier is found to be "not readily achievable," Defendants still violated the ADA, per §12182(b)(2)(A)(v) by failing to provide all goods, services, privileges, advantages and accommodations through alternative methods that were "readily achievable."

118.    On information and belief, as of the date of Plaintiff's encounter at the premises and as of the filing of this Complaint, Defendants' actions, policies, and physical premises have denied and continue to deny full and equal access to Plaintiff and to other mobility disabled persons in other respects, which violate Plaintiff's right to full and equal access and which discriminate against Plaintiff on the basis of her disabilities, thus wrongfully denying to Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations, in violation of 42 U.S.C. §12182 and §12183 of the ADA.

119.   Defendants' actions continue to deny Plaintiff's rights to full and equal access and discriminated and continue to discriminate against her on the basis of her disabilities, thus wrongfully denying to Plaintiff the full and equal enjoyment of Defendants' goods, services, facilities, privileges, advantages and accommodations, in violation of the ADA, 42 U.S.C. §12182.

120.   Further, each and every violation of the Americans With Disabilities Act of 1990 also constitutes a separate and distinct violation of California Civil Code §51(f), §52, §54(c) and §54.1(d), thus independently justifying an award of damages and injunctive relief pursuant to California law, including but not limited to Civil Code §54.3 and §55.

## SECOND CAUSE OF ACTION

Violation of the Unruh Civil Rights Act

(California Civil Code §51, *et seq.*)

(Against All Defendants)

121.   Plaintiff alleges and incorporates by reference, as if fully set forth again herein, each and every allegation contained in all prior paragraphs of this complaint.

122.   California Civil Code §51 provides that physically disabled persons are free and equal citizens of the state, regardless of their medical condition or disability:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, **disability, or medical condition** are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

California Civil Code §51(b) (emphasis added).

123.   California Civil Code §51.5 also states, in part: "No business, establishment of any kind whatsoever shall discriminate against…any person in this state on account" of their disability.

124.   California Civil Code §51(f) specifically incorporates (by reference) an individual's rights under the ADA into the Unruh Act.

125.   California Civil Code §52 provides that the discrimination by Defendants against Plaintiff on the basis of her disability constitutes a violation of the general antidiscrimination provisions of §51 and §52.

126.   Each of Defendants' discriminatory acts or omissions constitutes a separate and distinct violation of California Civil Code §52, which provides that:

> Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to section 51, 51.5, or 51.6 is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

127.   Any violation of the Americans with Disabilities Act of 1990 constitutes a violation of California Civil Code §51(f), thus independently justifying an award of damages and injunctive relief pursuant to California law, including Civil Code §52.  Per Civil Code §51(f), "A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section."

128.   The actions and omissions of Defendants as herein alleged constitute a denial of access to and use of the described public facilities by physically disabled persons within the meaning of California Civil Code §51 and §52.

129.   The discriminatory denial of equal access to and use of the described public facilities caused Plaintiff difficulty, discomfort, and embarrassment.

130.   As a proximate result of Defendants' action and omissions, Defendants have discriminated against Plaintiff in violation of Civil Code §51 and §52, and are responsible for statutory, compensatory and actual damages to Plaintiff, according to proof.

**PRAYER FOR RELIEF**

Plaintiff has no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiff has suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiff is granted the relief she requests. Plaintiff and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the laws of the United States and the State of California.

The need for relief is critical because the civil rights at issue are paramount under the laws of the United States of America and the State of California.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

1. Issue a preliminary and permanent injunction directing Defendants as current owners, operators, lessors, and/or lessees of the Subject Property and premises to modify the above described property, premises, policies and related facilities to provide full and equal access to all persons, including persons with physical disabilities; and issue a preliminary and permanent injunction pursuant to ADA §12188(a) and state law directing Defendants to provide facilities and services usable by Plaintiff and similarly situated persons with disabilities, and which provide full and equal access, as required by law, and to maintain such accessible facilities once they are provided; to cease any discriminatory policies; and to train Defendants' employees and agents how to recognize disabled persons and accommodate their rights and needs;

2. Retain jurisdiction over the Defendants until such time as the Court is satisfied that Defendants' unlawful policies, practices, acts and omissions, and maintenance of physically inaccessible public

facilities and policies as complained of herein no longer occur, and cannot recur;

       3.     Award to Plaintiff all appropriate damages, including but not limited to actual and statutory damages according to proof;

       4.     Award to Plaintiff all reasonable attorney fees, litigation expenses, and costs of this proceeding pursuant to 42 U.S.C §12205 and California Civil Code §52; and

       5.     Grant such other and further relief as this Court may deem just and proper.

DATED: December 18, 2025           **VALENTI LAW APC**

                                 By:   */s/ Matthew D. Valenti*

                                      Matthew D. Valenti
                                      Attorney for Plaintiff
                                      Judi Rivera

# JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims and issues for which a jury is permitted.


DATED: December 18, 2025                **VALENTI LAW APC**


By:    */s/ Matthew D. Valenti*
_____
Matthew D. Valenti
Attorney for Plaintiff
Judi Rivera